# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | |
| | ) | |
| Universal Pain Center, 6001 W. North Ave., Wauwatosa, WI 53213, further described in Attachment C | ) ) | Case No. 18·M·1240 |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Universal Pain Center, 6001 W. North Ave., Wauwatosa, WI 53213, further described in Attachment C

located in the Eastern District of Wisconsin, there is now concealed:

See Attachments A & B

The basis for the search under Fed. R. Crim P. 41(c) is:

- ■ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 21 U.S.C. §§ 841(a)(1) and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Neil McGrath, DEA TFO
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 4/4/18

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable William Duffin , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Neil McGrath, being duly sworn, depose and state as follows:

## I.     TRAINING AND BACKGROUND

1.      I am employed as a Special Agent with the State of Wisconsin Department of Justice Division of Criminal Investigation (DCI), and have been a full-time sworn law enforcement officer for over 21 years. I am currently assigned as a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) Tactical Diversion Squad (TDS). I have extensive training and experience in controlled substance trafficking investigations. As part of my duties as a DEA TFO, I investigate criminal violations relating to narcotics trafficking offenses, including, but not limited to, violations of Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses.

2.      This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation.

3.      Based on the my training and experience, and my participation in investigations of the diversion of pharmaceutical controlled substances, I know that medical clinics that employ prescribers of controlled substances, such as the Universal

1

Pain Center, more fully described in Attachment C, typically have within their premises "patient records," and I know that such records:

a.     generally purport to document services rendered to patients;

b.     typically include patient files, prescription records, medical reports, notes of medical personnel and staff members, office notes, progress notes, medical examination notes, medical diagnoses, appointment records, patient sign in sheets, billing records, test results, laboratory tests, laboratory results, photographs, x-rays, physician orders, history and physical forms, social worker notes, treatment plans, referrals, consultations, correspondence, patient contracts, patient information, demographic information, and certificates of medical necessity; and

c.     are usually maintained, along with similar records, in the normal course of a medical clinic's daily business activities at the clinic.

4.     Based on my training and experience, I have found that the presence or absence of such records and the content of such records is relevant in determining whether controlled substances have been prescribed within the normal practice of medicine and for a legitimate medical purpose. Furthermore, based on my training and experience, medical clinics retain patient files for a minimum of five years from the date of the last entry in the records.

5.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

6.     Because this affidavit is submitted for the limited purpose of securing authorization for the warrant described below, I have not included each and every fact

2

known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrant.

## II.      PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED

7.      I make this affidavit in support of a search warrant application for the business of Universal Pain Center, **6001 W. North Ave., Wauwatosa, WI 53213**, further described in Attachment C. The Universal Pain Center contains evidence related to violations of the federal controlled substance laws including violations related to the distribution of controlled substances outside the scope of legitimate medical purpose, and a conspiracy to do the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I therefore request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachments A and B.

## III.     PROBABLE CAUSE

### Summary

8.      There is probable cause to believe that Justin Hanson (who is a roofer by trade with no medical training or experience) conspired with others to distribute controlled substances through a pain clinic he co-owned named Wauwatosa Pain Management Clinic ("WPM") and then Universal Pain Center ("Universal") (collectively "the clinic"). Evidence shows that since its founding in March of 2013 and continuing through the present, prescribers at the clinic have been prescribing to patients oxycodone (and other narcotics) for which there was no legitimate medical purpose. Prescribers, such as former co-owner, Nurse Practitioner ("N.P.") Lisa Hofschulz, did so because of an agreement with Hanson; other prescribers did so

3

because of pressure Hanson and potentially others put on them. Beginning in or around 2013, WPM and then Universal began operating out of the address at **6001 W. North Ave., Wauwatosa, WI 53213**. Medical records available at the clinic will provide evidence of prescriptions of controlled substances without legitimate medical purpose.

### Background of the Business

9.      Interviews of former employees disclose that Justin Hanson is a roofer by trade, but in 2013 he began to discuss opening a pain management clinic with N.P. Lisa Hofschulz (who could prescribe narcotics). After some negotiation, they agreed to open a pain clinic together as 50-50 partners. The name of the clinic was Wauwatosa Pain Management and it was registered with the State of Wisconsin Department of Financial Institutions on March 31, 2013. Hanson does not have a medical background and has not received medical training. While financial records indicate that the clinic was successful (in terms of making a lot of money), Hofschulz and Hanson had personal issues with each other, and Hanson terminated her from the partnership in approximately November of 2014.

10.      In December of 2014, Hofschulz opened her own pain clinic and took many of WPM's patients with her. Around this time, Hanson sold Hofschulz's half of the business to a medical group (NuMale Medical) and they re-named the clinic Universal Pain Center. Currently, Hanson is a co-owner of Universal with other individuals associated with the NuMale Medical group, such as Christopher Asandra. Kimberly Stein (Niswonger) is the office manager for Universal and has held that position since before Hofschulz left in November of 2014. There have been many

4

prescribers (mostly Nurse Practitioners) who have worked at the clinic, but the main prescriber currently is N.P. J█ D█

11.     According to former employees, WPM/Universal was and is largely a cash-only business. Patients must pay approximately $300 in cash for their initial visit, and then pay approximately $200 for each subsequent visit. Case agents called Universal in November 2017 and inquired about becoming a new patient. The individual who answered the phone at Universal explained that it cost $300 cash to visit the clinic and $200 for each subsequent visit. Patients (who are frequently low-income and have insurance, such as Medicare or Medicaid) could pay a small co-pay to visit other clinics and receive treatment, but instead pay large amounts of cash to be patients at WPM/Universal. Based on my training and experience, and the investigation to date, patients choose to pay large amounts of cash to be seen by prescribers at WPM/Universal because they reliably and consistently receive opioids without a legitimate medical purpose.

### Information Obtained from Former Prescribers

12.     At least two former prescribers of WPM/Universal have faced or are facing disciplinary action by the State of Wisconsin for prescribing Oxycodone without legitimate medical justification. For example, in a Final Decision and Order dated February 11, 2016, the State Board of Nursing made the following findings about a N.P. (named R.M.) who worked at WPM/Universal:

    a.      Between January 2014 and May 2015, R.M. wrote 1,747 prescriptions for Oxycodone which was 65% of his/her total prescriptions.

5

b.  R.M. admitted to writing prescriptions for patients who she/he felt were not taking the medication and, in some cases, were selling the medication. R.M. stated he/she did this because he/she felt compelled to by Clinic management.

c.  R.M. admitted that he/she felt approximately 50% of his/her patients had a legitimate need for pain medication.

d.  R.M. admitted to pre-dating prescriptions and acknowledged that it is bad practice to do so.

e.  R.M. admitted to prescribing narcotics to patients without a legitimate medical purpose.

13.  In an interview, R.M. stated that on multiple occasions she discharged patients only to find out that they had been "undischarged" by N.P. Hofschulz. For example, R.M. discharged ▮▮▮▮▮▮▮▮▮▮ because he failed a pill count[1] yet he continued to receive medications at WPM. R.M. stated that she spoke with Hofschulz about this and Hofschulz responded that Hanson told Hofschulz that it was fine to continue to treat him. ▮▮▮▮▮▮▮▮▮▮ also failed his pill count yet continued to receive medications from WPM after R.M. discharged him. R.M. pointed out that both ▮▮▮ and ▮▮▮ were friends with Justin Hanson and R.M. overheard Hanson tell Hofschulz that he could vouch for him and requested he not be discharged, although R.M. was not sure if Hanson was referring to ▮▮ or ▮▮.

14.  R.M. also stated that ▮▮▮▮▮▮▮▮▮▮▮▮ attended an appointment with his father, ▮▮▮▮▮▮▮▮▮▮▮▮ who was a patient at WPM

---

[1] A pill count occurs when a person from the clinic tells a patient to come into the clinic mid-month and show how many pills he/she has remaining. If a patient was prescribed 120 Oxycodone 30 mg pills per month and the clinic requested a pill count mid-month, and the patient does not have any Oxycodone 30 mg pills remaining, it is a good indication that he/she is abusing his/her prescription medication or selling it.

6

and demanded to receive the same dosage of medication as his father because he claimed to have the same medical condition. R.M. refused and ███████ became verbally abusive to R.M. and demanded to talk to Hofschulz who ultimately prescribed oxycodone to ███████ Also, ████████████████████ wife of ███████ and mother of ███████, failed a pill count so R.M. discharged her. R.M. found it odd and suspicious that multiple family members, such as the ███████ needed the same medication, had the same medical condition, and had their appointments so they could be seen together.

15.     Based on a review of prescriptions written by R.M., case agents identified the following patients as receiving questionable prescriptions:

- ████████████████████ – Monthly, from April 2014 to August 2014, Patient ███████ was prescribed 90 clonazepam 0.5 mg, 15 fentanyl 75mcg/hr and 180 oxycodone HCL 15mg. The clonazepam and oxycodone were dispensed at a WalMart pharmacy and the fentanyl was dispensed at Walgreens on the same day.

- ████████████████████) – Monthly, from June 2014 to August 2014, Patient ███████ was prescribed 60 amphetamine-dextroamphetamine 20mg, 120 methadone hcl 10mg and 150 oxycodone HCL 30mg.

- ████████████████████ – In April 2014 and May 2014, Patient ███████ as prescribed 15 fentanyl 75mcg/hr and 180 oxycodone HCL 15mg.

16.     Hanson had a pattern of hiring young, new, nurse practitioners (such as R.M.) and attempting to influence them into prescribing narcotics for which there was not a legitimate medical purpose. For example, case agents interviewed A.S., who was employed as a N.P. at WPM/Universal from August 2014 to May 2015. N.P. Hofschulz

was her direct supervisor through November 2014. A.S. noted that when she started working at WPM, she recognized most patients were already on high doses of oxycodone previously prescribed by N.P. Hofschulz. She noted that N.P. Hofschulz continually increased doses of Oxycodone for patients.

17. A.S. stated that she felt pressured by Hanson to prescribe high doses of narcotics. Hanson pressured A.S. by telling A.S. (on four separate occasions) that when she cut patients Oxycodone doses, she was costing the clinic money, and if the clinic lost money he would have to terminate staff (including a staff member who was pregnant).

18. A.S. also described the lax, or lack of, standards WPM/Universal had for prescribing narcotics. WPM/Universal allowed patients who tested positive for cocaine and marijuana to continue receiving Oxycodone. If A.S. did not find medical need for patients to receive narcotics, A.S. would refuse to treat the patient, but then would feel pressured by office manager Niswonger and Hanson to prescribe anyway. WPC/Universal conducted urine screens[2] and pill counts, however, WPC/Universal stopped pill counts once the clinic began losing money for non-compliant, discharged patients. Furthermore, A.S. stated she had concerns about the volume of younger patients and patients traveling a great distance to the clinic. Based on my training and experience, a large percentage of young patients and patients travelling a great distance

---

[2] Pain clinics conduct urine screens to show whether an individual is actually taking the prescribed medication. For example, if a patient was prescribed 120 Oxycodone 30 mg pills per month and the urine screen did not show any Oxycodone in it, that is a good indication that the patient is selling the medication. Urine screens can also be used to test to see whether the patient is taking other illegal drugs that should not be combined with prescribed narcotics.

to visit the clinic indicates that prescribers may be prescribing without legitimate medical justification.

19.     A.S. reported that she had several patients tell her that they had an "understanding" with Justin Hanson (who has no medical training) regarding their prescriptions and that they were paying the per visit fee in order to continue their high doses of narcotics.

20.     Agents also interviewed J.K., a Medical Doctor, who was employed at Universal from early December 2014 through January 29, 2015. Dr. J.K. stated that she only stayed at the clinic as long as she did because she was hoping to make changes to the clinic. Dr. J.K. stated that she was shocked at the high doses of narcotics patients were on, and thought that the clinic was just a "pill mill." She stated that many patients were furious with her for changing or attempting to change their prescriptions and many threatened to talk to Hanson. Patients would complain that they paid $200 or $300 in cash and were not getting what they wanted. Dr. J.K. stated that N.P. Hofschulz continued to prescribe to patients who had negative urine screens for medications they were prescribed, including one who tested negative for six months.

21.     Dr. J.K. stated that Hanson had no medical training, but often tried to recommend what medication she should prescribe. Dr. J.K. also stated that the office manager, Niswonger, would come into the exam room and try to negotiate for narcotics on a patient's behalf. There were occasions when patients would become upset because they were not prescribed what they wanted, and Niswonger would refund them the cost of their visit. Based on my training and experience and the investigation to date,

9

refunding patients who did not receive the narcotics that they expected shows that the patients had an understanding that they were not paying for a medical diagnosis, but were paying for narcotics.

22.    Hanson told Dr. J.K. that the clinic was losing patients because of her, that she was discharging too many patients, and that the clinic was not making money. She stated that Hanson told Niswonger not to do any more pill counts after Dr. J.K. began discharging non-complaint patients.

23.    On December 18, 2014, Hanson met with Dr. J.K. and warned her that if she continued to reduce the amount of prescriptions for narcotics, she would be out of a job. On January 19, 2015, Hanson told Dr. J.K. and several nurse practitioners "someone is going to lose their job because I can't afford you all when patients keep leaving." The investigation has obtained emails from an account known to be used by Hanson, including the below emails that show Hanson attempted to influence prescribing:

    a.    On January 26, 2015, at 1:19 p.m., justinhanson19832011@gmail.com wrote: "I'm at wits end with J[ ]. I'm going to listen in on a couple of her visits with patients tomorrow and if I don't like what I hear I'm going to let her go."

    b.    brad@numale.com responded to justinhanson19832011@gmail.com (among others) several hours later, stating "Do what u have to."

24.    On January 27, 2015, Dr. J.K. confronted Hanson after learning that he was complaining about her prescribing practices, and Dr. J.K. told Hanson that 98% of the clinic's patients should be discharged. Hanson fired Dr. J.K. on January 29, 2015. Dr. J.K. told case agents that Hanson seemed to know personally several of the patients. Dr. J.K. reported that patients frequently tested negative for narcotics they were being

prescribed and positive for other drugs such as cocaine. Dr. J.K. was aware that pharmacists called Universal on a near daily basis questioning patient prescriptions. Dr. J.K. was able to review partial patient records and conveyed the following information:

- ███████████████████████—Unfinished note. He was an alcoholic whose sister called Dr. J.K. and stated that he was abusing his medications and that Dr. J.K. should stop prescribing to him. Dr. J.K. discussed this with office manager Niswonger who told her that was not possible.

- ███████████████████████—Patient was prescribed oxycodone. Dr. J.K. ordered an additional test (PGXL) when a urine screen indicated that the patient was not taking the medication. A PGXL would confirm that a patient was not actually taking the medications or whether the patient simply metabolized them faster than a normal person. Records indicate patient did not undergo the PGXL and other prescribers kept prescribing.

- ███████████████████████—Patient had dramatic increase in pain medication despite indicating pain was 75% controlled.

- ███████████████████████—New patient who was not taking any pain medication, and received a large prescription of Oxycodone on his first visit.

- ███████████████████████—Patient with heroin addiction and requested increase in Oxycodone prescription. He also had multiple negative urine screens.

- ███████████████████████—Patient was receiving oxycodone doses that were not consistent with MRI results.

- ███████████████████████—Dr. J.K. discharged patient due to being on methadone and having no EKG. Hanson informed Dr. J.K. that she was not allowed to do this and the patient was seen thereafter at the clinic.

- ███████████████████████—Numerous positive urine screens for morphine even though morphine was not prescribed.



- ███████████████████—Patient was discharged for a positive urine screen for cocaine and amphetamine and then seen again by clinic.

- ███████████████████ Prescribed fentanyl and Oxycodone by other prescribers; Dr. J.K. decreased prescriptions and discussed weaning off pain medications, and patient did not return to the clinic.

- ███████████████████—Patient was discharged for positive urine screen for cocaine and benzodiazepine. Patient returned to clinic and was discharged again for another positive cocaine urine screen.

- ███████████████████—case agents are aware ███████████ ███████████████ who has been charged as a large-scale distributor of Oxycodone in the Milwaukee area in ███████████████████ ██████████ He was implicated in the investigation although not charged.

- ███████████████████ Dr. J.K. ordered a PGXL to determine whether urine screens reflected patient non-compliance. Patient never returned for follow up.

- ███████████████████—Chart reflected no current medications; patient prescribed oxycodone 30mg 5 times daily, oxycontin 15mg, among other medication.

- ███████████████████—Dr. J.K. discussed weaning patient from pain medication, and patient never returned to clinic.

- ███████████████████—Implicated as large-scale source of oxycodone in criminal Oxycodone case ███████████████████ ███████████

- ███████████████████—Dr. J.K. discussed decreasing and decreased pain medication, and patient did not return to the clinic.

**Patients Identified by Law Enforcement**

25.     In April 2017, eight individuals were charged in Washington County, Wisconsin with a conspiracy to sell heroin and other narcotics (including oxycodone).

One individual obtained 450 oxycodone pills per month via prescriptions from two pain clinics in Milwaukee and from street dealers. Universal is one of the clinics named in the complaint. Medicaid prescription data reveals that at least three of the charged individuals ████████████████████████████████████ and ██████ ███████████████████) received oxycodone prescriptions from J██ D███ and T███ W███ (who were both prescribers at Universal).

26.    In July of 2015, case agents received an anonymous tip that ███████ ████████████████████ was selling little blue pills and big orange pills with "60" imprinted on them that he was prescribed at WPM. Prescription records confirm that ███████has been prescribed a variety of narcotics at Universal including Oxycontin 60 mg pills (which are orange and have a 60 imprinted on them) and Oxycodone 30 mg, which can be small and blue.

27.    In October of 2015, an anonymous caller reported to case agents that ███████████████████████ lived at███████████████████ made $4,000 per month selling oxycodone in the Milwaukee area, and that the caller had personally witnesses some of these transactions. The caller reported that she received her prescriptions from Universal and filled her prescriptions at CVS Pharmacy. Prescription records confirm that ████████████ received large narcotics prescriptions from prescribers at Universal and that she filled her prescriptions at CVS Pharmacy.

28.    A confidential source of information informed case agents that ████████ ████████████████████was selling oxycodone and was also a patient at Universal.

Prescription records confirm that he was prescribed Oxycodone as a patient at Universal.

29.    Case agents received information from the Forest County Sheriff's Office that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was arrested in March of 2016 for selling Oxycodone 30 mg pills prescribed by prescribers at Universal. The investigator from Forest County attempted to notify the prescriber at Universal of this information. He left a message with a receptionist for the prescriber to call him back. However, he never received a call back. He called a second time, and he believes that he was hung up on. Prescription records show that ▮▮▮▮ still appears to be a patient at Universal.

30.    Case agents received information from Forest County Sheriff's Office that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was arrested on February 18, 2016, for selling Oxycodone 30 mg pills prescribed by prescribers at Universal. Prescription records show that he continued receiving controlled substances from Universal through November 2016. In February of 2016, the investigator called Universal and spoke with an individual at the clinic who said she would notify the doctor. The investigator asked to speak directly to the doctor, but the individual refused. The investigator left contact information with the individual and asked that the doctor return the call. His call was never returned.

### Prescription Data Shows Universal Continues to Operate as a Pill Mill

31.    Case agents also reviewed prescription information for the Wisconsin Prescription Drug Monitoring Program and looked at current and former prescribers employed at WPM and Universal. From October 23, 2013 until November 15, 2014

(when Hofschulz was a N.P. at WPM) she wrote 7,256 prescriptions for controlled substances. Of those, 84.4% were for narcotics (6,124) including 4,614 for Oxycodone, 738 for methadone, 506 for morphine, and 45 for hydrocodone. Based on my training and experience, and the investigation to date, that number of controlled substance prescriptions indicates that that N.P. Hofschulz was prescribing controlled substances without legitimate medical justification.

32. N.P. T████ W████, who worked at the clinic from May 2015 until November 2016 issued 12,777 controlled substance prescriptions from May 8, 2015 until November 22, 2016. Approximately 8,400 of those prescriptions were for some type of oxycodone. Based on the investigation to date, and my training and experience, that number of oxycodone prescriptions indicates that N.P. W█ was prescribing oxycodone to patients without a legitimate medical purpose.

33. Case agents conducted a review of the number of prescriptions paid by Medicaid[3] for all clinicians for Wisconsin prescribers from January 2017 to July 2017. The review focused on pharmacy claims for Oxycodone 10 mg, 15 mg, 20 mg, and 30 mg pills. Case agents ranked prescribers by (1) the number of pharmacy claims submitted to Medicaid; (2) the number of pills prescribed/dispensed by the prescriber; and (3) the number of pills dispensed per pharmacy claim. ██D████ who is a N.P. at Universal, was at or near the top in all three categories. D████ ranked 2nd in number of pharmacy claims (3,561), 2nd in number of pills dispensed (548,435), and 1st

---

[3] Although WPM and Universal are cash-only businesses, patients can still use Medicaid to pay the pharmacy when they pick up their prescriptions.

15

in average number of pills dispensed per pharmacy claim. Based on the investigation to date, and my training and experience, that number of Oxycodone prescriptions indicates that N.P. D█████ is likely prescribing Oxycodone to patients without a legitimate medical purpose.

34. Based on my training and experience, individuals who obtain prescriptions for large quantities and/or combinations of controlled substances often fill prescriptions at different pharmacies, including traveling significant distances between pharmacies, in an attempt to avoid suspicion by pharmacists and increase the likelihood of getting such prescriptions filled. This pattern has been found with patient ███████████████████████) who has obtained prescriptions for oxycodone and morphine sulfate from J███ D█████ every month from May 2016 to at least November 2017. ██████ has had the morphine prescriptions filled at WalMart Pharmacies in Appleton, De Pere, Green Bay, Plover, and Wausau, Wisconsin and at Sam's Club Pharmacy in Appleton, Wisconsin, while having the oxycodone prescriptions filled at WalMart Pharmacies in Appleton, Plover, Portage, and Wausau, Wisconsin, and Sam's Club Pharmacies in Appleton, Franklin, and West Allis, Wisconsin.

35. Universal patient ████████████████████████ has obtained oxycodone every month from June 2016 to September 2017 and had them filled at nine different Walgreens and Sam's Club pharmacies during this time.

36. Based on my training and experience, individuals traveling long distances to obtain prescriptions for large quantities of narcotics also indicates that the prescriber is prescribing the narcotics for without a legitimate medical purpose. A review of Julie

16

D█████ prescribing data shows many such individuals, who traveled from the following locations: Wisconsin Rapids, Wisconsin; Markesan, Wisconsin; Lomira, Wisconsin; Weyauwega, Wisconsin; Ogdensburg, Wisconsin; Neopit, Wisconsin; Green Bay, Wisconsin; Appleton, Wisconsin; Pembine, Wisconsin; Marinette, Wisconsin; New Holstein, Wisconsin; Sheboygan, Wisconsin; Manitowoc, Wisconsin; Plover, Wisconsin; Kenesha, Wisconsin; Oakfield, Wisconsin; Nekoosa, WI; Shawno, Wisconsin; and Iolaw, Wisconsin.

### Patient Deaths:

37.    Case agents have learned that the following individuals died of acute mixed drug intoxication within a relatively short period of time after obtaining a prescription from WPM or Universal:

- ████████████████████████

    o On January 7, 2014, ████ picked up 60 oxycodone 20 mg and 120 oxycodone 30 mg that were prescribed by N.P. Lisa Hofschulz the same day.

    o On January 27, 2014, ████ picked up 60 clonazepam that were prescribed by N.P. Hofschulz on the same day.

    o On January 28, 2014, ████ picked up 150 oxycodone 30 mg that were prescribed by N.P. Hofschulz on January 27, 2014.

    o On February 9, 2014, ████ died of acute mixed drug intoxication (oxycodone, oxymorphone, and tramadol)

- ████████████████████████

    o On September 29, 2015, ████████ picked up 90 pregablin 75mg that were prescribed to her by T████ W████ APNP on September 4, 2015.

17



- o On October 1, 2015, ▮▮▮▮s picked up prescriptions of 120 oxycodone 10mg and 60 methadone 10mg that were prescribed by T▮▮▮ W▮▮ on September 4, 2015.

- o On October 7, 2015, ▮▮▮▮ died of an acute mixed drug intoxication (oxycodone, methadone, alprazolam and meprobamate).

- ▮▮▮▮▮▮▮▮▮▮▮▮

  - o On December 2, 2015, ▮▮▮ picked up a prescription of 60 oxycodone 30mg and 120 oxycodone 30mg that was written by T▮▮▮ W▮▮ on December 1, 2015.

  - o On December 2, 2015, ▮▮▮ died of an acute mixed drug intoxication (oxycodone, diazepam and diphenhydramine).

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

  - o On August 22, 2016, ▮▮▮▮▮▮ picked up a prescription of 120 oxycodone 30mg and 60 diazepam 10mg that were prescribed by T▮▮ W▮▮ on August 22, 2016.

  - o On August 30, 2016, ▮▮▮▮▮▮ icked up 30 hydrocodone bitartrate 30mg that were prescribed by T▮▮▮ W▮▮ on August 22, 2016.

  - o On September 21, 2016 ▮▮▮▮▮▮ picked up 60 diazepam 10mg that were prescribed by T▮▮▮ W▮▮ on August 22, 2016.

  - o ▮▮▮▮▮▮ died of an acute mixed drug toxicity (diazepam and heroin) on September 29, 2016.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮

  - o On January 26, 2017, ▮▮▮▮ picked up 60 oxycodone 30 mg prescribed by J▮▮ D▮▮ on January 25, 2017.

  - o On January 28, 2017, ▮▮▮▮ picked up 120 oxycodone 20mg that were prescribed by J▮▮ D▮▮ on January 28, 2017.

- On January 30, 2017, ███████ died of an acute mixed intoxication (cocaine, oxycodone and alprazolam).

- ████████████████████████████

  - On February 8, 2017, ████ picked up a prescription of 180 oxycodone 30mg prescribed by J██ D████ on February 2, 2017.

  - On February 11, 2017, ████ died of an acute mixed drug intoxication (oxycodone, oxymorphone, alprazolam, mirtazepine, nortriptyline, and amphetamine)

- ████████████████████████████

  - On June 7, 2017, ██████ picked up a prescription of 180 oxycodone 30mg that was prescribed by J██ D████ on June 5, 2017.

  - On June 8, 2017, ████ ied of an acute mixed drug intoxication (oxycodone, cyclopropyl, fentanyl and alprazolam)

### RECORDS AND OTHER EVIDENCE TO BE SEIZED

38.     As noted above, the prescribers at WPM and Universal used patient records in the course of prescribing controlled substances throughout the conspiracy and while prescribing controlled substances without a legitimate medical purpose. Based upon interviews with former employees, my training and experience, and my familiarity with this investigation, I know that such records:

a.      generally purport to document services rendered to patients;

b.      typically include patient files, prescription records, medical reports, notes of medical personnel and staff members, office notes, progress notes, medical examination notes, medical diagnoses, appointment records, patient sign in sheets, billing records, test results, laboratory tests, laboratory results, photographs, x-rays, physician orders, history and physical forms, social worker notes, treatment plans, referrals, consultations, correspondence, patient contracts,

patient information, demographic information, and certificates of medical necessity; and

c.    are usually maintained, along with similar records, in the normal course of a medical clinic's daily business activities at the clinic.

39.    Based on my training and experience, I also know that medical clinics,

including those involved in the distribution of controlled substances outside the usual

course of professional practice and without a legitimate medical purpose, generally

maintain:

a.    records related to their employees and personnel, including: resumes, application forms, licenses, job descriptions, time sheets, employment agreements, bonus agreements, management reviews, hiring records, termination records, contracts, IRS Forms 1099 and W-2, cancelled checks, expense reimbursement documents, and credit card receipts for all current and former officers, employees and independent contractors;

b.    records related to service contracts into which the clinic has entered with physicians, medical professionals, and other entities for purposes of providing services to the clinic's patients, which records include: contracts, employment agreements, and notes and correspondence;

c.    records of employee schedules and appointments, including calendars, appointment books, logs and patient sign-in sheets;

d.    records of patient complaints, allegations of substandard care, and unnecessary services performed by representatives, employees, and agents of the clinic;

e.    books, manuals, memoranda, and documents outlining the clinic's policies on patient care, procedures for treating patients, and procedures for billing patients, insurance providers, and plans;

f.    financial records reflecting the earnings, income, profits, and assets of the clinic and its owners and corporate officers and directors, including: bank statements, bank books, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, check books, brokerage and investment account records, stock certificates, credit cards, credit card statements, tax returns, tax return information, information returns, appraisal

20

documents, title documents, safe deposit box keys, storage facility keys, and documents evidencing account numbers and financial assets of the clinic and its owners and corporate officers and directors;

g.     documents identifying other locations where the clinic may maintain financial, medical, and billing records, such as additional office space or storage units; and

h.     documents identifying the owner(s) of the clinic.

40.     Based on my training and experience, I also know that medical clinics generally keep records described in the preceding paragraphs in both "hard copy" form and on computers or associated networks.

41.     Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computers and electronic files stored on a network that are evidence of a crime. In this case, the warrant application requests permission to search and seize records relating to the distribution of controlled substances. I also request permission to seize the computer hardware or to create an identical copy of information stored on a network if it becomes necessary for reasons of practicality to conduct a search for the requested documents offsite. I believes that, in this case, the computer hardware and network storage is potentially a container for evidence.

42.     I know, based on training and experience, that searching and seizing information from computers or networks often requires agents to seize most or all electronic storage devices (along with related peripherals) and to create an image of the network to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

a. <u>The volume of evidence</u>. Computer storage devices (like hard disks, diskettes, tapes, laser disks, auxiliary storage devices) can store the equivalent of millions of pieces of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b. <u>Technical Requirements</u>. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

43. If, upon arriving at the scene, the agents executing the search concludes that it would be impractical to search the computers or network information on-site for this evidence, I request the Court's permission to seize the computer hardware (and associated peripherals) and create an identical copy of the information that is stored on a network that is believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware or copy of the information contained on the network for the evidence described.

## IV. CONCLUSION

44. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the Universal Pain Center, described in Attachment C, possesses evidence related to violations of the federal controlled substance laws including violations related to the distribution of controlled substances outside the scope of legitimate medical purpose, and a conspiracy to do the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I, therefore, request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachments A and B.

## ATTACHMENT A

Evidence of violations of Title 21, United States Code, Sections 841(a)(1) (distribution of controlled substances outside the usual course of professional practice and without a legitimate medical purpose) and Title 21, United States Code, Section 846 (conspiracy to distribute controlled substances), as follows:

1. Patient files listed in Attachment B, including but not limited to the complete patient files, prescription records, medical reports, notes of medical personnel and staff members, office notes, progress notes, medical examination notes, medical diagnoses, appointment records, patient sign in sheets, billing records, test results, laboratory tests and results, photographs, x-rays, physician orders, history and physical forms, treatment plans, referrals, consultations, correspondence, patient contracts, patient information, demographic information, and certificates of medical necessity.

2. Prescription forms that may relate to the crimes under investigation, such as pre-filled or pre-signed prescription forms.

3. Records reflecting any polices or procedures of the clinic

4. Records of patient complaints, allegations of substandard care, and unnecessary services performed by representatives, employees and agents of the clinic.

5. Records related to employees and personnel including but not limited to resumes, application forms, licenses, job descriptions, time sheets, employment agreements, management reviews, hiring records, termination records, contracts, IRS Forms 1099 and W-2, cancelled checks, expense reimbursement documents, and credit card receipts for all current and former clinic owners, officers, employees and independent contractors.

6. Communications in any form involving current and former clinic owners, officers, employees, independent contractors, potential or actual patients, insurance companies, or government entities to the extent the communications may relate to the crimes under investigation.

7. Records that tend to show the activities, location, or compensation of current and former clinic owners, officers, employees and independent contractors, including:

   a. Calendars, schedules, appointment books, timesheets, or address books;

   b. Compensation agreements and payments; or

c.     Documentation related to purchase or other transfer of assets.

8.     Corporate records for the clinic, including meeting minutes, strategic planning documents, financial projections and budgets, organizational charts, or other records reflecting corporate decision-making and responsibilities.

9.     Financial records reflecting the earnings, income, profits, and assets of the clinic and its owners and corporate officers and directors, including: bank statements, bank books, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, check books, brokerage and investment account records, stock certificates, credit cards, credit card statements, tax returns, tax return information, appraisal documents, title documents, safe deposit box keys, storage facility keys, and documents evidencing account members and financial assets of the clinic and its owners and corporate officers and directors.

10.     Any and all electronic devices which are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, and other computer related electronic devices. Documents in any format or medium that concern any accounts with an Internet Service Provider.

11.     Documents in any format or medium that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.     Items reflecting the use of file-sharing technology (not to include contents of files shared that are not otherwise within the scope of this attachment).

13.     Items in the paragraphs above that are stored in computer media, including media capable of being read by a computer (such as external and internal computer hard drives, memory sticks, and thumb drives).

14.     Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises, including, but not limited to, canceled mail, leases, rental agreements, utility and telephone bills, statements, identification documents, and keys.

15.     Items of personal property that tend to establish ownership of assets, including, but not limited to, insurance documents, property titles, receipts for purchases of assets.

16.    Documents identifying other locations where the clinic may maintain financial, medical, and billing records, such as additional office space or storage units.

## ATTACHMENT B

Patient files and records to be seized related to the following individuals.

Patient Name                    Date of Birth

1.
2.
3.
4.
5.
6.
7.
8.

9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.

26.
27.
28.
29.
30.
31.
32.
33.

27

34.
35.



36.
37.
38.
39.
40.
41.
42.

## ATTACHMENT C

The premise to be searched is the business of the Universal Pain Center: 6001 W. North Ave., Wauwatosa, WI 53213. It is located on the southwest corner of the intersection of W. North Ave. and N. 60th St. It is an office located on the first floor of a brick, two story structure with a red front door on the north side of the building face W. North Ave. The building and sign in front of the building do say 6001 and 6005, however, the Universal Pain Center advertises itself to be located at 6001 W. North Ave., Wauwatosa, WI 53213, so that is the address used.

